IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>JARED D. BROOKS,<br>　　　　　　　　　Debtor(s). | CASE NO. BK18-40417-TLS<br><br>CHAPTER 11 |
| JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>　　　　　　　　　Plaintiff(s)<br>　vs.<br><br>JARED D. BROOKS,<br>　　　　　　　　　Defendants(s). | ADV. NO. A18-04016-TLS |
| JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>　　　　　　　　　Plaintiff(s)<br>　vs.<br><br>JARED D. BROOKS;<br>FIRST CENTRAL BANK MCCOOK; and BROOKS FARMS, LLC<br>　　　　　　　　　Defendants(s).<br><br>JARED D. BROOKS; and BROOKS FARMS, LLC<br>　　　　Counter-Claimants<br>　vs.<br><br>JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>　　　　Counter-Defendants | ADV. NO. A18-04025-TLS |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>JEFFREY D. BROOKS,<br>                      Debtor(s). | CASE NO. BK18-40418-TLS<br><br>CHAPTER 12 |
| JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>                      Plaintiff(s)<br>vs.<br><br>JEFFREY D. BROOKS,<br>                      Defendants(s). | ADV. NO. A18-04017-TLS |
| JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>                      Plaintiff(s)<br>vs.<br><br>JEFFREY D. BROOKS;<br>FIRST CENTRAL BANK MCCOOK; and<br>BROOKS FARMS, LLC<br>                      Defendants(s).<br><br>JEFFREY D. BROOKS; and BROOKS FARMS, LLC<br>                      Counter-Claimants<br>vs.<br><br>JASPER FANNING, as Personal Representative of the Estate of Calvin Freehling; and SUSAN FREEHLING,<br><br>                      Counter-Defendants | ADV. NO. A18-04024-TLS |

<u>MEMORANDUM</u>

These cases came before the Court for a consolidated trial on July 21 and 22, 2020.

Michael Samuelson and Robert Reynolds appeared for the plaintiffs. John Hahn appeared for the defendants Jeffrey D. Brooks, Jared D. Brooks and Brooks Farms, LLC (collectively "Brooks"). David Pederson appeared for defendant First Central Bank of McCook ("Bank"). The parties submitted written closing arguments after the trial, and the matter is now ready for decision.

## *UNDISPUTED FACTS*

The parties have agreed to the following facts in their amended pretrial statement[1]:

1. On March 14, 2018, Debtor Jared Brooks filed a voluntary petition under Chapter 12 of the United States Bankruptcy Code which was docketed as Case No. 18-40417 before this Court (the "Jared Brooks Bankruptcy Case"). That same day, Debtor Jeffrey Brooks filed a voluntary petition under Chapter 12 of the United States Bankruptcy Code which was docketed as Case No. 18-40418 before this Court (the "Jeffrey Brooks Bankruptcy Case").

2. On July 13, 2018, the Jared Brooks Bankruptcy Case was converted to Chapter 11.

3. These adversary proceedings arise under and are related to the Jared Brooks Bankruptcy Case and Jeffrey Brooks Bankruptcy Case.

4. The United States Bankruptcy Court for the District of Nebraska has jurisdiction over these proceedings pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a). These actions are core proceedings as defined in 28 U.S.C. § 157(b).

5. Plaintiffs Calvin L. Freehling and Susan M. Freehling are residents of McCook, Red Willow County, Nebraska.

6. Jared Brooks and Jeffrey Brooks were at all times relevant herein residents of Red Willow County, Nebraska.

7. First Central Bank McCook is a State Banking Association with a principal place of business in McCook, Red Willow County, Nebraska.

8. Brooks Farms, LLC, is a Nebraska limited liability company duly created, organized and existing under the laws of the State of Nebraska.

9. Jared Brooks and Jeff Brooks are the members of Brooks Farms LLC, a Nebraska limited liability company.

---

[1] The facts listed in paragraphs 1 - 39 below are verbatim from the amended pretrial statement of the parties (Fil. #50).

10. Plaintiffs' cattle brand, as maintained by the Nebraska Brand Committee, is attached as Exhibit A to each adversary complaint.

11. On December 21, 2017, and December 26, 2017, Brooks allowed a brand inspector to inspect the Brooks/Freehling herd.

12. The cattle share arrangement between Brooks and Freehlings began at approximately the end of 2008.

13. Pursuant to the terms of the cattle agreement between Freehlings and Brooks, Freehlings would present bred females to the Brooks in the fall of each year. Upon presentment, the Brooks were responsible for providing all necessary care, feed and maintenance for the bred cattle and their offspring through weaning of the calves the following fall. Brooks were also responsible for providing the bulls.[2]

14. Freehlings were responsible for providing the bulls for the Freehlings' replacement heifers and also the feed expense for any of the Freehlings' replacement heifers until they entered into the herd as a bred female.

15. Per the terms of the agreement, the Brooks were responsible for calving the Freehlings' cattle as well as branding the cattle to demonstrate the appropriate ownership based upon the agreed-upon split of the calf crop.

16. Compliance with the terms of the cattle share arrangement entitled the Freehlings to receive 35% of the year's calf crop while Brooks would receive 65% of that year's calf crop.

17. The amount received by Brooks in any given year could take the form of sale proceeds, calves retained by Brooks, or a combination of sale proceeds and retained calves.

18. For any calves that carried the Freehling brand and were thereafter retained by Brooks and branded with Brooks' brand, this resulted in some calves carrying both brands.

19. Part of the Freehling herd was intermingled with cattle owned by Brooks and Brooks retained possession and control of all of the Freehling cattle at all times from 2008 through 2017.

20. Each fall Brooks and Freehling would meet to settle up on expenses. Prior to weaning, each party would decide whether to sell their share of the calf crop at weaning or to retain for feeding for a period of time.

---

[2] This is verbatim from the pretrial statement. The following sentence (¶14) states that the Freehlings were responsible for providing the bulls for the replacement heifers. Therefore, it appears that the intent of this provision at ¶13 is that Brooks were responsible for providing bulls for future breeding of the herd.

21. Freehling had purchased 181 heifers on March 7, 2016, which did not produce any calves in 2016.

22. In 2017 Freehling sold 90 cows and lost 3 cows to death.

23. Freehlings purchased no cows in 2017.

24. During the year 2017, Calvin Freehling suffered from some medical conditions and Susan Freehling was dealing with Brooks. Susan told Brooks that the Freehling calves were to be sold at weaning and requested cattle inventory numbers from Brooks.

25. In the fall of 2017 Susan Freehling and Jasper Fanning claimed that the Freehling herd should be larger than Brooks were reporting.

26. Multiple brand inspections were done by the State of Nebraska Brand Inspector in approximately December of 2017.

27. The Freehlings and Brooks are both loan customers of First Central Bank, having received financing previously from First Central Bank.

28. First Central Bank is a creditor in each of the Brooks bankruptcies.

29. On January 26, 2018, the Freehlings commenced an action in the District Court of Red Willow County, Nebraska (Case No. CI 18-18), against Jared Brooks, Jeff Brooks, and Brooks Farms LLC, which, among multiple causes of action, sought to replevin cattle.

30. On approximately January 27, 2018, the Freehlings utilized self-help to reclaim some of their cattle in central Nebraska.

31. On February 8, 2018, Jeff Brooks filed a UCC lien against Calvin and Susan Freehling (Filing #9818030242-0). The Freehlings dispute the validity of the lien as well as the amounts claimed therein.

32. The calves from the 2018 calf crop have all been sold.

33. On October 22, 2018, 254 calves were sold at Tri-State Livestock in McCook with the net proceeds totaling $198,867.23.

34. On November 1, 2018, 314 calves were sold at Valentine Livestock Auction Company in Valentine, Nebraska, with the net proceeds totaling $232,956.34.

35. On November 12, 2018, an additional 118 cattle were sold at Valentine Livestock Auction Company in Valentine, Nebraska, with the net proceeds totaling $107,50.05.

36. On November 19, 2018, 48 calves were sold at Tri State Livestock in McCook by Brooks. The net proceeds of $36,379.90 were divided between two checks with Jeff Strayer receiving $26,527.01 while Brooks and First Central Bank received the remaining $9,852.89.

37. The Freehlings sold all calves they possessed from the 2018 calf crop as follows:

| Date | Location | Number of Calves | Net Proceeds |
|---|---|---|---|
| 12/13/2018 | Ogallala Livestock | 205 | $165,019.74 |
| 01/31/2019 | Ogallala Livestock | 3 | $1,936.64 |

38. On May 8, 2019, Freehling sold 821 cattle at Ogallala Livestock Auction Market in Ogallala, Nebraska, and those net proceeds of $678,309.20 are currently being held by Ogallala Livestock Auction Market.

39. First Central Bank is currently in possession of net proceeds of $595,728.52, pending resolution of the ownership to the funds, based upon the following sales:

| Date | Location | Calves | Cows | Bulls | Net Proceeds |
|---|---|---|---|---|---|
| 10/22/2018 | McCook | 254 | | | $198,867.23 |
| 10/29/2018 | McCook | 3 | | | $ 827.12 |
| 11/01/2018 | Valentine | 314 | | | $232,956.34 |
| 11/12/2018 | Valentine | | 102 | 16 | $107,570.05 |
| 11/19/2018 | McCook | | 1 | 21 | $ 17,215.92 |
| 11/19/2018 | McCook | 48 | | | $ 9,852.89 |
| 12/06/2018 | Valentine | 1 | | | $ 605.24 |
| 12/13/2018 | Valentine | | 3 | | $ 1,946.02 |
| 12/15/2018 | McCook | | 13 | | $ 8,361.22 |
| 12/17/2018 | McCook | | 3 | | $ 1,735.97 |
| 12/17/2018 | McCook | | 11 | | $ 7,739.31 |
| 12/17/2018 | McCook | | | 19 | $ 4,871.21 |
| TOTAL | | 620 | 133 | 56 | $595,728.52 |

In addition to the undisputed facts set forth in the pretrial statement, additional uncontroverted facts were presented at trial, including:

40. Jeff Brooks testified that during the course of the arrangement between Freehlings and Brooks, Freehlings would periodically purchase calves sold by Brooks at auction and incorporate them into the herd as replacement heifers.

41. Jeff Brooks testified that Brooks never purchased calves from Freehlings, although Brooks may have received a few Freehling-branded calves "in trade" for certain expenses that may have been owed. To further explain the double-branded calves, Jeff Brooks testified that Brooks acquired some Freehling-branded calves "through our 65% . . . as part of our settlement for the calves."

42. Jeff Brooks testified that the calves were typically born in March and the cattle were moved to pasture in May. The calves were branded shortly before they were moved to pasture.

43. Jeff Brooks testified that during the arrangement, death losses were typically taken from the Brooks share — saying "We burdened the death loss most of the time" and "We ate a big portion of it."

44. In December of 2017 the entire Freehling/Brooks herd was inspected by the Nebraska Brand Committee. That inspection found the herd had a total of 954 head. Of those, 664 carried only the Freehling brand and 151 carried only the Brooks brand. Five had no brand and the remaining 134 carried both brands.

45. In January of 2018, the Freehlings repossessed 236 head, all of which bore the Freehling brand (although some were double-branded). Subsequently the Brooks bankruptcy cases were filed. In August of 2018, the Freehlings sought relief from the automatic bankruptcy stay and through that process, 520 additional cows were eventually returned to the Freehlings in 2018 after their calves were weaned. Calves born to those 520 cows in 2018 were not returned to the Freehlings. In total, 756 cows were repossessed or returned to Freehlings in 2018.

46. Beginning in late 2018 and continuing through 2019, the entire herd was liquidated. Some were sold by Freehlings and some were sold by Brooks and the Bank. Some (but not all) of the proceeds of the sales are being held pending the results of this trial.

47. Ogallala Livestock Market is holding $678,309.20 which resulted from the sale by the Freehlings on May 8, 2019, of 821 head of cows and calves. Bank is holding $595,728.52 which resulted from the sale of 620 calves, 133 cows and 56 bulls from October through December of 2018. Finally, the Nebraska Brand Committee is holding $166,084.71 which resulted from the sale by the Freehlings on March 4, 2020, of the remaining 133 cattle that they had in their possession.

## ISSUES AND WITNESSES

Four adversary proceedings among the parties were consolidated for trial. Cases A18-4016 and -4017 seek determinations in the bankruptcy cases of Jared and Jeffrey Brooks, respectively,

that certain indebtedness allegedly owed by Brooks to the plaintiffs is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). Cases A18-4024 and -4025 seek declaratory judgments in both Jared and Jeffrey's bankruptcy cases as to the ownership of the sales proceeds from the sale of cattle and the validity and enforceability of liens as to those proceeds.

Jasper Fanning testified at the trial. He is the personal representative of the estate of Calvin Freehling and has been substituted as one of the plaintiffs in place of Calvin. Jasper is the son-in-law of Calvin and Susan Freehling. In 2017 Calvin suffered some medical setbacks and Jasper began helping Susan with the cattle operations. Specifically, in 2017 Jasper began looking into discrepancies in cattle numbers between what he and Susan felt the herd should be and the numbers reported by Jeff Brooks. By the end of 2017, he had terminated the sharing arrangement with Brooks and demanded return of the cattle. Brooks refused.

Jasper testified that he began combing through records, including those of Calvin and Susan, as well as records he obtained from their banks and from cattle sale barns in the area. He compiled a running total of all cattle purchases by Calvin from the inception of the agreement with Brooks and for which he could find documentation (Fil. #97). He also found sale records for cows that were culled from the herd and sold (Fil. #98). By combining those two documents, he came up with a running total of the size of the herd at any given time from the inception of the agreement in 2008 to the end of 2017 (Fil. #96). By his calculations, the breeding herd should have had 792 cows at the end of 2017.

Jeffrey Brooks testified at trial. He disputed Jasper's assertion that the initial cow herd began with 56 head. Instead, Jeffrey testified that it was 38 head. Further testimony failed to clarify that discrepancy. He also testified that he and Calvin Freehling never had any disputes as to cow or calf ownership or distribution of proceeds. By Jeffrey's calculations, the Freehling herd should have had 665 head in the fall of 2017.

Additional witnesses included Don Moore (President and CEO of First Central Bank), Jared Brooks, Jason Hauxwell (loan officer at First Central Bank beginning in the fall of 2016), and Dr. Eric Behlke (expert witness who testified as to the condition of some of the cattle and as to industry standards).

Ultimately, the issues presented to the Court primarily involved the question of who is entitled to the various pots of money described in uncontroverted fact #47 above. The briefing of the parties did not reveal any true "legal" issues for the Court's consideration in connection with the declaratory judgment actions A18-4024 and A18-4025. Instead, the issue in those cases is simply a question of who owned the cattle that resulted in the proceeds. So, at the outset, the Court recognizes that due to the verbal nature of the cattle share agreement, the length of time that the agreement was in effect, and the lack of contemporaneous records kept by the parties, it is impossible to answer that question with 100% accuracy. The Court will instead endeavor to find the most fair result based on the facts as presented.

*DISCUSSION*

The parties expended substantial briefing efforts on the question of what start date to use to "reconstruct" the size of the Freehling herd. Freehlings use bank and sale barn records to project the cattle numbers starting in 2008 through the dissolution of the agreement in 2018. While that method is based on actual records of purchases and sales, it does not take into account any records that may be missing. Brooks and Bank argue that the herd size should be reconstructed using undisputed calf sale numbers from 2016 — the last year there was no known dispute as to the division of the calf crop. That method uses several assumptions as to the percentage of the cows in the herd that produced a calf, average death loss and average cull rate. That method further assumes the distribution in 2016 was proper and agreed upon, rather than just accepted without analysis.

Instead of relying entirely upon potentially incomplete record reconstruction or assumptions and averages, the Court will address the claims of each party to the various pots of money that are in dispute.

### *$678,309.20 held by Ogallala Livestock Market.*

These funds resulted from the sale by the Freehlings of 821 head of cattle (a mixture of cows and calves) at Ogallala Livestock Market on May 8, 2019. It is undisputed that all of the cattle sold bore the Freehling brand, although an undetermined number were double-branded.[3] The Freehlings, through Jasper Fanning, produced detailed records showing cattle purchases and sales by Calvin Freehling throughout the entire ten-year course of the arrangement with Brooks. Mr. Fanning accumulated those records from bank statements and cattle barns in the area.

Brooks purported to dispute the cattle calculations, but failed to produce a single document or record to contradict the records found by Mr. Fanning. Bank also disputed Fanning's calculations without producing any evidence. Bank did, however, create a document purporting to show how the number of cows owned by each party should be calculated, but those numbers were based on speculation derived from industry averages for calf production, cull numbers, and death loss.[4] Accordingly, the Court finds that Mr. Fanning's calculations with back-up documentation at Fil. #s 96 – 98 are the most reliable evidence of what the Freehling breeding herd size should have been at various points in time. Of course, at the same time, the Court recognizes the possibility that even those records may be incomplete, but they are the most reliable evidence that was provided.

According to Fil. #96, the Freehlings' breeding herd should have had approximately 792 cows at the end of 2017. Therefore, the Court finds that the Freehlings were entitled to all of the

---

[3] The sale included 317 "cow-calf pairs" which would indicate at least 317 of the animals sold were new (not yet weaned) calves born in 2019 to cows possessed by Freehlings.

[4] The Bank's calculations were also based on the assumption that the 2016 calf split was accurate and was a fully informed agreement.

756 cows that were repossessed or returned to them in 2018. The fact that some of those cows were double-branded with both the Freehlings' brand and the Brooks' brand is of no consequence. The evidence clearly showed that Freehlings frequently purchased hundreds of Brooks calves as replacement heifers at auction, which would explain why they would own cows carrying both brands.

Bank and Brooks argue that Brooks (and therefore Bank) are entitled to 65% of the 2018 calf crop from the 756 cows repossessed or returned to Freehlings in 2018. However, the only calves Freehlings would have in 2018 were the calves born to the 236 cows repossessed in January of 2018 as Bank and/or Brooks kept the remaining 520 cows until their 2018 calves were weaned later in the year and did not return any of those calves. Further, those retained calves will be dealt with in the following section addressing the funds held by Bank.

The argument by Brooks and Bank appears to be that Brooks bore the expense of breeding the 236 cows before they were repossessed by Freehlings, so Brooks should be entitled to a share of the calf crop from those cows. However, due to the nature of the agreement between the parties, that argument fails. The agreement has been alternatively referenced as a "lease" and a "calf share agreement." Regardless, it is undisputed that at the beginning of the agreement the Freehlings provided a bred female. When new heifers were added to the herd, the Freehlings paid the expenses for that heifer until it became bred. So, the Freehlings were required to provide on the front end a bred female and had no further expense for that female once it entered the breeding herd. There was no evidence presented as to what should be returned at the end of the agreement, and it appears likely the parties never discussed that issue. However, it seems clear that when a lease or other similar agreement is terminated, the lessee is required to return what the lessee received. Here, that would mean a bred female. Accordingly, the Freehlings were entitled to a bred female at the end of the agreement, so they are entitled to retain all of the proceeds from the sale of calves later born to the cows repossessed by or returned to them.

Further, the Freehlings are not required to reimburse anyone for the expenses of caring for the cows until they were returned. It is undisputed that the agreement required Brooks to pay all expenses for caring for the cows and their calves, and their compensation for doing so was their 65% calf share over the years. In this instance, Brooks (or Bank) kept 100% of the calf crop produced by the cows that were returned late in 2018. Those funds will be addressed as part of the following section pertaining to the funds held by Bank.

For the foregoing reasons, the Freehlings are entitled to 100% of the funds held by Ogallala Livestock Market in the amount of $678,309.20.

### *$166,084.71 held by Nebraska Brand Committee.*

By all accounts, these funds are the final proceeds from the sale on March 4, 2020, of the remaining cows repossessed by or returned to the Freehlings, and calves produced by those cows while in possession of the Freehlings. The analysis above regarding the funds held by Ogallala Livestock Market applies here, and for those same reasons, the Freehlings are entitled to 100% of

the $166,084.71 held by the Nebraska Brand Committee.

**$595,728.52 held by Bank.**

These funds represent the proceeds of the liquidation during October, November and December 2018 of the remaining herd maintained by Brooks and/or Bank. The breakdown of these proceeds is at undisputed fact #39 above, and included the sale of 620 calves, 133 cows and 56 bulls. The calves sold were produced by the 133 cows sold at the same time, as well as by the 520 cows returned to the Freehlings in late 2018 after the calves were weaned. So, the 620 calves were produced by 653 cows.

Freehlings argue that they are entitled to the proceeds from 182 calves, representing 35% of the 520 calves produced by their 520 cows. However, there is no evidence that all 520 Freehling cows produced a calf. According to the undisputed data, 620 calves from 653 cows made it to market, which is a 95% success rate. Applying that 95% rate to the 520 Freehling cows results in a total of 494 calves. Therefore, Freehlings can only claim the proceeds of 35% of 494 calves — or 173 calves.

The total proceeds from the calf sales as set forth in undisputed fact #39 above are $443,108.82. Divided by 620 calves, that equals an average of $714.69 per calf. Multiplied by 173 calves equals $123,641.37, which is the Freehlings' share of the calf sale proceeds. Bank and Brooks argue that the cost of caring for the cows and calves should be deducted from the Freehlings' share of the sale proceeds. However, that is illogical. In 2018, Bank and Brooks performed the final obligations of Brooks under the lease or calf share agreement with the Freehlings before returning the remaining cows.[5] At all times during the ten years of the agreement, Brooks absorbed all costs related to the bred cows and calves in exchange for 65% of the calf crop. They cannot now come in and change the terms just because the agreement had come to an end. The cost of caring for all the cows and calves comes out of the Brooks 65% calf crop share, as it had every year of the agreement.

The Court's understanding is that the 133 cows and 56 bulls that were sold did not carry the Freehling brand and no evidence was presented to show that any of those animals belonged to the Freehlings. There was speculation and conjecture, but no evidence. Therefore, the Court denies any claim by the Freehlings to any of those cow or bull sale proceeds.

For the foregoing reasons, the Court finds that the Freehlings are entitled to $123,641.37 from the $595,728.52 held by the Bank. The remainder belongs to Brooks and/or Bank under its security interest.

---

[5] The evidence failed to indicate whether any of the 520 cows returned to Freehlings after the weaning of the calves were bred as required by the agreement.

*UCC Filing by Brooks*

At Fil. #79 is a purported agister's lien against 700 head of pregnant cattle in the amount of $656,453.90 filed by Jeffrey Brooks against Calvin Freehling dated February 8, 2018. This lien was filed after the repossession by Freehlings of some of their cattle and around the time that the Freehlings filed a replevin action against Brooks. Brooks and Bank did not attempt to argue the validity of this lien at trial, nor did they present any evidence to support it.

Since the Court has determined the rights of the parties to the cattle proceeds as set forth above, the issue of the lien is moot. Further, the lien is invalid in any event. The Court has already found that upon termination of the cattle share agreement, Brooks was required to return to the Freehlings that which they received at inception — a bred female. That is what the Freehlings received for the 236 cows that were repossessed. Further, for the 520 bred females that were not returned to the Freehlings before calving, Brooks were entitled to 65% of the calf sale proceeds, which they will receive from the sale of the calves from those 520 cows as set forth above. Accordingly, the agister's lien filed by Jeff Brooks is invalid and unenforceable.

*UCC Filing by Brian and Ami Hauxwell*

At Fil. #100 is an agricultural lien filed by Brian and Ami Hauxwell against Calvin Freehling on May 8, 2019. It seems clear from the evidence that this feed lien is for feed related to the obligations of Brooks under the cattle share agreement. However, the Hauxwells are not a party to this adversary proceeding. Therefore, the Court cannot make any determination as to the validity of this lien.

*Exception to Discharge*

In addition to their requests in A18-4024 and A18-4025 for declaratory judgment regarding the division of the cattle sale proceeds and the validity of the UCC filings, the Freehlings also filed A18-4016 and A18-4017 against Jared and Jeffrey Brooks, respectively. Those adversary proceedings seek a determination that certain indebtedness owed by Brooks to Freehlings should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4).

To meet the burden of proving that a Debtor is not entitled to a discharge of a debt owed under § 523(a)(2)(A), the Plaintiff must show that Debtor "(1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage." *Takuski v. Kurtz (In re Kurtz)*, 604 B.R. 549, 558 (Bankr. D. Neb. 2019). A creditor seeking to except a debt from discharge under this section has the burden of proving each element by a preponderance of the evidence. *Id*. 11 U.S.C. § 523(a)(4) excepts from discharge debts arising from embezzlement or larceny.

These claims fail for several reasons.

First, Freehlings have failed to establish a specific debt owed to them by Brooks that should be excepted from discharge. In this order the Court has declared which parties are entitled to various pots of money that are the proceeds of the sale of cattle. Those declarations are not judgments requiring Brooks to pay any money to Freehlings. At trial, and in their briefs, Freehlings do not even attempt to quantify a debt owed by Brooks.

Second, Freehlings' claims appear to be based on the position that Brooks misbranded calves during the years of the agreement and that a number of cows are "missing". This is likely based on the calculations by Mr. Fanning as to how many cows should have been in the herd versus the number of cows that were actually recovered. However, as indicated earlier, due to the "loose" way that Calvin Freehling and Brooks did business, there is no way to determine whether Fanning's calculations are 100% accurate and, therefore, whether there are or are not any missing cattle. In any event, in the prior sections of this Order, the Freehlings are recovering the proceeds of the vast majority of the cattle to which they have made a claim.

Third, the Court finds as a matter of law that the evidence failed to establish Brooks intentionally misappropriated any cows or calves that belong to Freehlings. There were, of course, genuine disputes over ownership, but those disputes were the result of sloppy practices by all parties, and not from fraud, larceny or embezzlement.

Therefore, the Court finds that the Freehlings' claims in Adversary Proceedings 18-4016 and 18-4017 should be dismissed.

**CONCLUSION**

For the reasons set forth above, it is ordered that a separate judgment shall be entered in Adversary Proceedings 18-4024 and 4025 declaring that: (1) the sum of $678,309.20 held by Ogallala Livestock Market should be paid to the Plaintiffs, subject to any valid secured creditor lien that may exist; (2) the sum of $166,084.71 held by the Nebraska Brand Committee should be paid to the Plaintiffs, subject to any valid secured creditor lien that may exist; (3) Plaintiffs are entitled to the sum of $123,641.37 from the $595,728.52 held by the Bank, subject to any valid secured creditor lien that may exist, and the balance of those funds may be retained by Bank to be applied on account of the indebtedness of Brooks to Bank; (4) the February 8, 2018, UCC filing by Jeffrey Brooks against Calvin Freehling is invalid; and (5) the Court will not take any action regarding the May 8, 2019, UCC filing by Brian and Ami Hauxwell. The Court further orders that Adversary Proceedings 18-4016 and 18-4017 should be dismissed.

DATED: October 15, 2020.

BY THE COURT:

/s/ Thomas L. Saladino
Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Michael Samuelson
    *Robert Reynolds
    John Hahn
    United States Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.